COMMONWEALTH vs. DANIEL J. LAPLANTE

Middlesex. September 14, 1993. - November 16, 1993.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, & GREANEY, JJ.

*Homicide. Constitutional Law*, Search and seizure. *Search and Seizure*, Warrant, Multiple occupancy building, Plain view. *Evidence*, Business record. *Insanity*.

In a criminal case, the judge correctly denied the defendant's motion to suppress evidence seized in the execution of a search warrant that allegedly misidentified the defendant's house as a single-family dwelling, where the description of the property was based on a reasonable investigation by the police and adequately described the nature of the structure apparent to a reasonable observer, and where, in any event, the defendant had sufficient access to and control over the entire structure so as to warrant a finding of probable cause to search the entire building. [438-439]

In a criminal case involving the search of premises pursuant to a search warrant, police officers properly seized certain items not listed on the warrant that were in plain view where either they had probable cause to believe the items were stolen, or the relevance of the items did not become apparant until they were pointed out to police during the search as belonging to the defendant. [439-440]

No basis appeared under the "fruit of the poisonous tree" doctrine for suppression of evidence in a murder case seized in a second, later-executed search warrant where the first warrant and search were lawful. [440-441]

At a murder trial, any error in the admission of certain documentary evidence as a business record (without sufficient foundation) was not prejudicial where it was merely repetitive of other evidence properly admitted. [441-443]

No evidence at a murder trial supported the defendant's request for a jury instruction on the issue of criminal responsibility. [443-444]

INDICTMENTS found and returned in the Superior Court Department on January 12, 1988.

A pretrial motion to suppress evidence was heard by *Robert A. Barton*, J., and the cases were tried before him.

*Janet L. Sanders* (*Robert L. Sheketoff* with her) for the defendant.

*Thomas F. Reilly*, District Attorney (*Michael L. Fabbri*, Special Assistant District Attorney, with him) for the Commonwealth.

ABRAMS, J. Convicted of murder in the first degree on three indictments, the defendant, Daniel J. LaPlante, appeals. He alleges error in (1) the denial of his motions to suppress; (2) the admission of a business record; and (3) the judge's failure to instruct the jury on the issue of insanity. The defendant requests that we order a new trial. We decline to exercise our power under G. L. c. 278, § 33E (1992 ed.), in favor of the defendant to enter verdicts of a lesser degree of guilt or to order a new trial. We affirm.

1. We set forth the evidence in the light most favorable to the Commonwealth. *Commonwealth* v. *Salemme*, 395 Mass. 594, 595 (1985). At approximately 5 P.M. on December 1, 1987, Andrew Gustafson discovered the body of his wife, Priscilla Gustafson, on the bed in the master bedroom of the family's home in Townsend. She died as a result of two shots at close range with a .22 caliber firearm. The shots were fired through a pillow which lay on top of the victim's head. Gustafson telephoned the police immediately, who, on arrival, discovered the bodies of Gustafson's two children, William, five years old, and Abigail, almost eight years old. The police found William's body face down in the tub in the upstairs bathroom. The police discovered Abigail's body face down in the tub in the downstairs bathroom. The cause of death of both children was drowning. Additionally, Abigail suffered blunt trauma to the head and compression of the neck.

Karolyn LeClaire, a chemist with the Department of Public Safety, found semen and sperm cells near one corner of the bedspread, and a portion of a condom on the floor beside the bed. In the bedroom closet, LeClaire found a knotted brown sock dampened with saliva, consistent with having been used as a gag. She also found seven "ligatures" — a

necktie, a sock, stockings, and pantyhose which had been knotted and cut. In the bedroom, police found a nearly full bottle of beer, that apparently had been taken from the Gustafson refrigerator. In the kitchen wastebasket, police found several pieces of paper which were torn from the pages of a pornographic magazine.

The defendant lived with his family in October, 1987. The evidence showed that the defendant engaged in a series of daytime burglaries in the neighborhood, including a burglary of the Gustafson home in November, 1987. On October 14, 1987, between 12 P.M. and 2:15 P.M., someone broke into 38 Elm Street, the home of Raymond Pindell and his family.[1] Two Ruger .22 caliber guns and their holsters were stolen, as was a sizable amount of cash. Approximately three weeks later, the defendant's stepfather discovered one of Pindell's stolen guns and its holster in the defendant's laundry basket. When confronted by his parents, the defendant claimed he had obtained the gun a year earlier from Westminster. The second of the two firearms stolen from the Pindell house later proved to be the weapon used to kill Priscilla Gustafson. During this same time period, the defendant's brother, Stephen LaPlante, and Michael Polowski both saw the defendant with a few hundred dollars in cash, although the defendant was unemployed at the time.

On November 16, 1987, between 11:30 A.M. and 3:30 P.M., someone broke into the Gustafson home. Among other things, the thief took a cordless telephone, two cable television boxes, a cable television remote control device, and some coins from a Liberty silver dollar collection. The defendant placed the Gustafsons' cordless telephone and a cable box in his brother's tool cabinet. The defendant told his brother that he was putting them there to prevent his parents from seeing them. At that time, the defendant's brother also saw the defendant with some silver coins similar to those re-

---

[1] The Pindell home was located less than one-quarter mile from the defendant's home. The backyards of the two houses are connected by a trail.

ported missing from the Gustafson home, including a Statue of Liberty coin in a box.

During this period, the defendant asked both his brother and Polowski for bullets. The defendant told them he wanted to make a large bullet and sell it. Toward the end of November, Polowski gave the defendant a number of .22 caliber bullets from a carton he owned. Polowski gave the remaining bullets to a coworker. Subsequent ballistics tests and laboratory analysis of the remaining bullets revealed that they were the same brand, caliber class, and casing composition as the ones used in the murder of Priscilla Gustafson.

The Commonwealth also linked the defendant to the murders through physical evidence. Laboratory analysis of the defendant's blood revealed that he is a "Type A secretor" — the same status of the semen stain discovered on the bedspread where Priscilla Gustafson's body was found. Laboratory analysis also revealed that fibers, bearing the same microscopic and optical characteristics as a fiber sample taken from a shirt located in the woods were found (1) on the clothing worn by the defendant on the day of the murders; (2) on the socks found in his bedroom; (3) on the belt found with the murder weapon; and (4) in three places at the murder scene. In addition, fiber samples taken from the sock believed to be used to gag Priscilla Gustafson matched samples found on the gray shirt worn by the defendant on the day of the murders.

The Commonwealth offered evidence of consciousness of guilt. The defendant left his home on the evening of December 2, 1987, after State police arrived and asked to speak with him. The next afternoon, the defendant unlawfully entered two homes in Pepperell, stole a .32 caliber revolver, and unsuccessfully tried to gain admittance into a third home. At the home of Pamela Makela in Pepperell, the defendant ordered Makela at gunpoint to drive him in her van to Fitchburg. Makela jumped out of the van, and the defendant continued on in her van. The defendant was arrested in an Ayer industrial park dumpster. At police barracks, while searching the defendant, police found a loaded .32 caliber revolver hid-

den in the defendant's underwear, and a .32 caliber bullet inside his right sneaker.[2]

2. *The motions to suppress.* A. *The investigation.* In conducting a search for evidence in the area surrounding the Gustafson residence, the Townsend police chief, William May, noticed several sneakerprints in a flower bed along the front of the house. Following the prints, Chief May determined that the Gustafson family nameplate was missing.[3]

That night, the police brought in tracking dogs who tracked into the woods behind the house. The next day, during a search of the woods between the Gustafson and LaPlante homes,[4] Trooper Sean Baxter found a blue and white flannel shirt. The Gustafsons' nameplate and a pair of soaking wet work gloves were wrapped inside the shirt. Chemical tests later indicated the presence of gunshot residue on the gloves. The tracking dogs sniffed the shirt, and began tracking through the woods. The dogs tracked through the defendant's yard, to within three to four feet of the defendant's home.

Two State troopers interviewed the defendant that afternoon in the Townsend public library. He told them that he spent the previous day home alone, watching television. When asked what he was wearing the previous day, he said he was wearing gray sweatpants, a football shirt, and a pair of Converse sneakers.[5] Police obtained search warrants for the defendant's home on December 2, 1987, and on December 11, 1987. During the searches, police seized several

---

[2]The primary theory of the defense was that there was insufficient evidence to conclude that the defendant, as opposed to others in the LaPlante house on December 1, 1987, committed the crimes. In particular, defense counsel suggested through cross-examination, that Michael Polowski, a close friend of Stephen LaPlante, was the perpetrator.

[3]Nothing else of value was taken from the Gustafson home that day.

[4]The two homes were located within one-half mile of each other, separated only by a stretch of woods.

[5]The footprints at the Gustafson home were identified as made by a size eleven to twelve Converse sneaker.

items not listed in the warrant.[6] On April 7, 1988, Stephen LaPlante and Polowski found the murder weapon in the glove compartment of an abandoned vehicle on the defendant's property.[7]

B. *The description of the premises.* The defendant contends that the December 2 search warrant misidentifies his home as a single-family home and that in fact the structure was a two-family dwelling. The defendant asserts that the warrant therefore was too broad, and that "the subsequent search of the second unit not occupied by the defendant was excessive." He concludes that the judge erred in not suppressing all the evidence seized as a result of both warrants. We do not agree.

The judge found that the premises had one mailbox with one number on it, one electric meter, and one central doorway. The judge determined that the police spoke with the town clerk and learned from the clerk that one family lived at that address. The judge noted that, although there were two gas meters on the structure, all other indicators of occupancy pointed to a single-family house. The judge ruled that for "all intents and purposes [the defendant's home] appears to be a single family residence. There is no indication from its outward appearance that it functions as anything but a single-family structure. The lack of any physical characteristics which would indicate multiple residency, plus the information received from the town clerk as to single occupancy satisfies this court that the description of the property in the warrant adequately represents the nature of the structure as

---

[6] Police seized a cordless telephone, a cable box, and a remote control cable device, all of which were identified by Andrew Gustafson as missing following a burglary on November 16, 1987. Police also seized a gray thermal shirt with blue stripes and a pair of gray sweatpants, the clothes which Stephen LaPlante reported seeing his brother wearing on the afternoon of the murders. In addition, police seized a pair of white athletic socks (one damp), a pair of gloves, and a number of spent .22 caliber cartridge casings bearing the initial "C." The defendant's left thumb print was found on the telephone in two places.

[7] The gun was a .22 caliber semi-automatic, loaded with four cartridges, all bearing the letter "C."

could be known to a reasonable observer." There was no error in denying the motion to suppress on this ground. If the police, after reasonable investigation, did not know and reasonably could not have known of the multi-unit character of the premises at the time of the warrant's issuance, a warrant to search the entire premises is valid. See *Maryland* v. *Garrison*, 480 U.S. 79, 86-87 (1987); *Commonwealth* v. *Luna*, 410 Mass. 131, 136 (1991); *Commonwealth* v. *Carrasco*, 405 Mass. 316, 324 (1989). The police made a reasonable investigation to ascertain whether the building was a multi-unit building. Further, the interior of the house reasonably appeared to be used by the entire family.[8] In these circumstances, the judge correctly denied the motion to suppress.

The judge also determined that, "even if sufficient indicators of multiple residency could be gleaned from the scant physical evidence available to the police, it is apparent that the defendant had sufficient access and control over the entire structure so as to warrant a finding of probable cause [to search] the entire building." See *United States* v. *Whitney*, 633 F.2d 902, 907-908 (9th Cir. 1980), cert. denied, 450 U.S. 1004 (1981); *United States* v. *Dorsey*, 591 F.2d 922, 930-931 (D.C. Cir. 1978). See also *Commonwealth* v. *Luna*, *supra*. There was no error.

C. *The scope of the search.* The defendant also challenges the scope of the December 2, 1987, search because police seized items not listed on the search warrant. The defendant contends that the Commonwealth failed to carry its burden of proving the items were properly seized under the plain view doctrine. See *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 303 (1979). We do not agree.

The six challenged items fall into two categories: the telephone and cable equipment found in a tool chest in Stephen LaPlante's section of the house, and various pieces of cloth-

---

[8]There was a central doorway, an interior foyer which appeared to provide common access to the entire premises, and the entire house was accessible by interior doorways. In addition, police officers observed Stephen LaPlante go from one part of the house to the other through unlocked interior doorways.

ing found in the defendant's closet. With respect to the cable box, remote control, and cordless telephone, the judge found that the "police upon viewing [these] items . . . had probable cause to believe that [they] were fruits of a previous break in at the Gustafson home." The judge's findings of fact are supported by the record. Because both prongs of the plain view doctrine were met, the admission of this evidence was proper.[9] *Commonwealth* v. *Cefalo*, 381 Mass. 319, 330-331 (1980).

The challenged items of clothing are a pair of gray sweatpants, a gray thermal shirt with blue stripes, and a pair of athletic socks (one wet). The judge determined that the relevance of the shirt and sweatpants became apparent at the time Stephen LaPlante identified them as being the clothes his brother was wearing on the afternoon of the murders. The discovery and taking of the wet sock in the vicinity of the shirt and the sweatpants was reasonable because of the children's drowning deaths. As to the requirement of inadvertence, police could not have included these items on the search warrant because these items were not identified until Stephen LaPlante pointed them out during the execution of the warrant. The clothing was validly seized under the plain view doctrine. See *Commonwealth* v. *Accaputo*, 380 Mass. 435, 448 (1980).[10]

Lastly, the defendant argues that all items seized pursuant to the December 11, 1987, search should have been sup-

---

[9] We need not reconsider the inadvertence requirement because inadvertence does not apply to stolen goods. *Commonwealth* v. *Hason*, 387 Mass. 169, 176 (1982). See *Commonwealth* v. *A Juvenile (No. 2)*, 411 Mass. 157, 164 n.8 (1991).

[10] At the suppression hearing, the defendant asserted that the warrant was not based on probable cause because part of the probable cause was based on "canine tracking" evidence. The defendant does not argue that on appeal. Therefore, it is deemed waived. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). Pursuant to G. L. c. 278, § 33E, we note that the supporting affidavit laid a sufficient foundation for consideration of the tracking evidence (qualifications of handlers and canines, their training, number of successful tracks, and behavior of the canines in directing the officers to the defendant's home). The judge correctly denied the motion on this ground and the defendant correctly does not argue otherwise.

pressed as "fruit of the poisonous tree." *Wong Sun* v. *United States*, 371 U.S. 471, 484-485 (1963). Because we hold that both the December 2, 1987, search warrant and the December 3, 1987, search were lawful, there is no basis for excluding the items seized on December 11, 1987.

3. *The admission of a business record pursuant to G. L. c. 233, § 78.* The defendant challenges the admission as a business record of one page of a document on the ground that the document did not satisfy the statutory requirements necessary to qualify under an exception to the hearsay rule.[11] The record in question was a pick-up order invoice from the American Metal Processing Company (AMP) in Wakefield. The record indicated that Polowski was in Wakefield at the time of the murders. The Commonwealth, however, called the keeper of the records at Nashoba Valley Structural Company, Inc. (Nashoba), to lay a foundation for the admission of the AMP record. Nashoba was Polowski's employer. The keeper said that Nashoba had a time clock system to record employees' work time, and an invoice system to record employees' activities. He testified that Polowski's time card indicated that he had arrived at work at 7:19 A.M., and left at 4:38 P.M.

The prosecutor then showed the keeper a two-page document, which was a joint record of AMP and Nashoba. The witness testified that the first page of the document had been retrieved from the files of AMP the previous day. He explained that in the ordinary course of events, a copy of the supplier company's invoice and Nashoba's pickup invoice are brought back by the driver on the same day as the pickup and are thereafter maintained by Nashoba. In this case, however, the supplier's invoice (the first page) was missing from Nashoba's files. He testified that the first page of the

---

[11]On appeal, the defendant argues that the evidentiary error was constitutional error. The record indicates he asserted two grounds for exclusion of the evidence: its repetitiveness and the failure to meet the statutory requirements. We consider those grounds. We note that evidentiary errors ordinarily are not of constitutional import. *Commonwealth* v. *Drew*, 397 Mass. 65, 78 n.13 (1986).

trial exhibit was actually a business record of AMP. The problem arises because Nashoba did not have, as it should have had, a copy of the AMP invoice in its files.

General Laws c. 233, § 78 (1992 ed.), allows for the admission of business records because of their presumed reliability. Reliability is presumed because entries in these records are routinely made by those charged with the responsibility of making accurate entries and are relied on in the course of doing business. See *Wingate* v. *Emery Air Freight Corp.*, 385 Mass. 402, 406 (1982). After hearing the witness's testimony, the judge determined that, even though the invoice had been missing from Nashoba's files, the copy maintained by AMP was part of a system of accounts and could be testified to by Nashoba's witness. See *Quinn Bros.* v. *Wecker*, 414 Mass. 815, 818 (1993). He did not require the Commonwealth to present testimony from the record keeper at AMP. We agree with the defendant that the judge should have required the Commonwealth to call the keeper of the records at AMP to introduce their document from its files. Any error, however, could not be prejudicial because the record was repetitive of other evidence.

Polowski's time card indicated that he had worked until 4:38 P.M., on December 1, 1987, which included three quarters of an hour of overtime. The record indicated that he arrived at AMP in Wakefield at 2:30 P.M. There was testimony that he left AMP at 3:30 P.M.[12] The Nashoba witness testified that it was his responsibility to verify any overtime submitted by Nashoba's employees. He was acquainted with the proprietor at AMP, which is a family run business. On the morning of December 2, 1987, he did in fact verify that Polowski had worked overtime. In addition, the witness testified that the second page of the challenged document was a Nashoba Valley business record, which corresponded to the AMP invoice. Thus, the one-page AMP invoice was cumula-

---

[12]There was evidence that the crimes were committed sometime between 1:30 P.M. and 5 P.M. A neighbor reported hearing a girl's scream from the direction of the Gustafson home at approximately 3:35 P.M.

tive of other evidence properly before the jury and any error was nonprejudicial. See *Commonwealth* v. *Sinnott,* 399 Mass. 863, 872 n.8 (1987).

4. *The failure to instruct on the issue of criminal responsibility.* The defendant asserts that the "bizarre nature of these killings together with the events following their commission were sufficient to create . . . a reasonable doubt as to [the defendant's] criminal responsibility." According to the defendant, the Commonwealth's evidence, if believed, required that the instruction be given. We do not agree.

The defendant relies on cases in which we said, "[T]he very facts of a crime themselves might be some evidence of the existence of legal insanity." *Commonwealth* v. *Mattson,* 377 Mass. 638, 644 (1979). *Commonwealth* v. *Laliberty,* 373 Mass. 238, 245-246 (1977).[13] The short answer to the defendant's claim is that there was no evidence that warranted an instruction on criminal responsibility. "[T]aking even a liberal approach to the submission of the insanity issue to the jury there simply [was] no triggering evidence in this case sufficient to require such an instruction. The defendant has not pointed to, nor can we find, any case where the inexplicableness of a crime alone raises a jury issue of insanity." *Commonwealth* v. *Mattson, supra* at 644. "That the crimes were heinous would not alone support a conclusion that they

---

[13]The cases relied on by the defendant do not support his argument that an insanity instruction was required. In each of those cases, there was a triggering event that indicated mental illness. See *Commonwealth* v. *Mills,* 400 Mass. 626, 629-630 (1987) (defendant exhibited irrational behavior before, during, and after the stabbing, and after resisting arrest requested that police kill him); *Commonwealth* v. *Monico,* 396 Mass. 793, 800-801 (1986) (defendant, who had a history of head injuries, changed his behavior dramatically after his head was shoved against a lamp); *Commonwealth* v. *Genius,* 387 Mass. 695, 698 (1982) (defendant mistakenly believed his lover had threatened him with a gun, had "snapped out," and did not recall the stabbings); *Commonwealth* v. *Laliberty,* 373 Mass. 238, 246 (1977) (defendant, who had no memory of the crime, compared his state of mind to "hallucinating" and "floating"); *Commonwealth* v. *Costa,* 360 Mass. 177, 182 (1971), and *Commonwealth* v. *Francis,* 355 Mass. 108, 110 (1969), *S.C.,* 411 Mass. 579 (1992), are inapplicable because there was expert testimony of mental incapacity in both cases.

were the product of an insane mind." *Commonwealth* v. *Freeman*, 407 Mass. 279, 286 (1990). On this record, there was no evidence which would trigger the need for an instruction on criminal responsibility.

5. *Review pursuant to G. L. c. 278, § 33E.* We have examined the whole record to determine whether justice requires that verdicts of lesser degrees of guilt be entered on the three murders in the first degree or that a new trial be ordered. We conclude that such relief is not required or appropriate.

*Judgments affirmed.*