COMMONWEALTH *vs.* LOUIS C. JOHNSON.

Middlesex. December 5, 1995. - April 9, 1996.

Present: LIACOS, C.J., WILKINS, O'CONNOR, GREANEY, & FRIED, JJ.

*Insanity. Practice, Criminal,* Instructions to jury, Admissions and confessions, Capital case. *Evidence,* Insanity, Admissions and confessions. *Malice. Homicide.*

Evidence at a murder trial was not sufficient to raise the issue of the defendant's criminal responsibility and there was no error in the judge's refusal to instruct the jury on the issue. [424-427]

At a murder trial the judge's instructions to the jury on malice, in the context of the entire charge, contained no reversible error. [427-429]

The record of a hearing on a motion to suppress a statement of the defendant made at the police station before he was booked and advised of his right to make a phone call pursuant to G. L. c. 276, § 33A, supported the judge's finding that the two-hour delay in booking was not intentional and was not designed to gain inculpatory information and he correctly denied the motion. [429]

INDICTMENTS found and returned in the Superior Court Department on March 5, 1992.

The cases were tried before *Robert A. Barton,* J.

*Lawrence Rizman* for the defendant.

*Marguerite T. Grant,* Assistant District Attorney (*David P. Linsky,* Assistant District Attorney, with her) for the Commonwealth.

LIACOS, C.J. On November 20, 1992, a Middlesex County jury found the defendant guilty of murder in the first degree of Kimberly Watkins, armed assault with intent to murder Pamela Watkins, armed assault with intent to murder Nekeya Gomez, and two indictments charging assault and battery by means of a dangerous weapon. He received a life sentence on the murder conviction and two concurrent terms of from eighteen to twenty years for the armed assaults convictions, to run from and after the life sentence for the murder convic-

tion.[1] On appeal, he claims error in the trial judge's instruction on malice, the judge's refusal to instruct the jury on lack of criminal responsibility (commonly referred to as the "insanity defense"), and the judge's allowance in evidence of certain statements made by the defendant while at the police station. We decline to exercise our power under G. L. c. 278, § 33E (1994 ed.), to enter a verdict of a lesser degree of guilt on the murder conviction or order a new trial. We affirm the convictions.

We recite the evidence presented to the jury.[2] *Commonwealth* v. *Burke*, 414 Mass. 252 (1993). Pamela Watkins knew the defendant as a teenager and met him again years later in 1987. They began dating and, in 1989, he moved into the home she shared with her daughter Kimberly at 150 Arlington Street in West Medford. In March, 1991, the defendant's fourteen year old daughter, Nekeya Gomez, moved in with them. Pamela worked full time as a systems analyst and was taking a computer class in the evenings. Her daughter Kimberly was ten years old. The defendant worked for a construction company. In September, 1991, Pamela told the defendant that their relationship was not working. She asked him to leave the apartment by January 1, 1992. In January, the defendant admitted to Pamela that, although he had left the house every morning as if he were going to work, he had in fact not worked since October and was afraid to tell her. He said he could not afford to rent another apartment, and Pamela agreed to allow the defendant and his daughter Nekeya to stay in the apartment rent free until February 1, 1992.

On January 27, 1992, Pamela returned from work to find the defendant upset about having to leave the apartment. He told her that her family was going to be sorry if she made him leave. Pamela went to her class and returned home

---

[1]The grand jury also returned three indictments charging armed assault in a dwelling, one indictment charging possession of a firearm, one indictment charging possession of ammunition, and one charging violation of a protective order. The Commonwealth chose not to proceed to trial on these indictments, and on November 12, 1992, they were nolle prossed. On two other indictments for assault and battery by means of a dangerous weapon, the jury found the defendant guilty. With the defendant's consent, these convictions were placed on file. Hence, they are not before us on this appeal.

[2]The defendant did not testify and presented no witnesses in his defense.

around 8 P.M. The defendant was there. Again, the defendant began arguing with her. In the course of the argument, he overturned the dining room table. He refused to allow her to speak privately on the telephone with Kimberly's father, remaining on an extension line. Pamela called her own father, again with the defendant on the extension, and her father said he would call the police.

Two Medford police officers arrived at the house around 9:10 P.M. The defendant was watching television. He was calm and responded to the officers' questions intelligently, but appeared to be under the influence of alcohol. He told the officers he had had two beers. He agreed to leave the house on Friday but said he would return on Sunday. When Pamela told him he could return on Sunday only to retrieve his belongings and could not stay, the defendant lowered his head and said, "Something bad is going to happen." He then said to Pamela, "When the police leave, I'll take care of this." The police then took the defendant into protective custody. He responded, "Fine. Just arrest me." Although he smelled of alcohol, the defendant was calm, engaged in conversation with the officers, and responded appropriately to booking questions.

The police assisted Pamela in obtaining an emergency protective order under G. L. c. 209A (1994 ed.). She then returned to the apartment and put the defendant's belongings in green plastic bags on the front porch as had been arranged with the police. She put Kimberly and Nekeya to bed on the second floor, made sure all the doors and windows were locked, turned out the lights on the front porch, and went to bed on the third floor at 12:45 A.M.

At about 1:30 A.M., the police released the defendant from protective custody. He was sober, calm, and cooperative. Two officers drove him to 150 Arlington Street to retrieve his belongings from the porch. The officers told the defendant not to return to the house and watched as the defendant put the bags in the back seat of his automobile. The officers followed the defendant's automobile for about two miles until he was "on his way."

The defendant "drove around" for about ten or twenty minutes, then went to his sister's house where he stayed only a few minutes. He stated that he "wanted to talk to her but she didn't want to hear it." He left his sister's house and

drove back to Medford, feeling rejected by his former boss and by Pamela, and not wanting to go to court the following morning to respond to the protective order. He parked his automobile on a different street "so the police would not see it parked in front of Arlington Street," and walked through two back yards to reach the back door of Pamela's apartment, "so the neighbors would not see me." He kicked in the back door, concealed a gun in the waist of his trousers, and went to the third-floor bedroom. Pamela awoke to the sound of the back door being kicked in and the defendant running up the stairs. She tried to use the telephone while she used her body to close the bedroom door. The defendant shot through the door. He continued repeatedly to shoot Pamela from three or four feet away, saying, "Die, bitch, die." He then said, "Watch this," and put the gun to his head. Pamela looked away, and when she turned again, he was gone.

The defendant went to the second floor after leaving Pamela's bedroom. The two girls were awake in the same bed. The defendant shot at them, wounding his daughter, Nekeya, and killing Pamela's daughter, Kimberly, with a gunshot to the head. He then tried to kill himself, but there were no bullets left in the gun.[3] He left the house, got into his automobile, and drove away. While driving, he looked for more ammunition in order to kill himself. He claimed he had difficulty because the traffic lights were all green. He stated to police that he knew he was shooting at his daughter, and that he shot at her because he did not want her to be a burden to anyone. He shot at Kimberly "because she was there."

At 2:50 A.M., the Medford police were ticketing a motor vehicle on Arlington Street when they saw the defendant's yellow automobile drive slowly past them. The police turned the cruiser around to pursue the defendant, but when they reached an intersection, they could not locate his vehicle. Simultaneously, the officers received a radio call from Medford police headquarters concerning the shooting at 150 Arlington Street. The police responded, and Nekeya answered the door, covered in blood. The police saw Kimberly on the sofabed, the upper part of her body off the bed. She was dead. They then went to the third floor where they saw Pamela Watkins, conscious but covered in blood. She told them that

---

[3] A ballistician testified at trial that four cartridge casings were recovered on the third floor and four cartridge casings on the second floor.

the defendant had shot her and was probably going to his sister's house.[4]

At about 3 A.M., two Boston police officers arrested the defendant near his sister's house. He had, in the waistband of his trousers, a nine millimeter Stallard Arms semi-automatic handgun. He held ammunition in his hand. He was sober, stable, and cooperative. When the defendant saw Lieutenant Robert Longo of the Medford police at the Boston police station at around 4:15 A.M., he said to him, "[Lieutenant], can I talk to you? I think I screwed up." The officer responded that he would talk with him later. The defendant was not booked until 4:50 A.M., when the Medford, Boston, and State police were all available. He was not questioned prior to booking. He received Miranda warnings, see *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and was informed of his right to make a telephone call, see G. L. c. 276, § 33A (1994 ed.). After booking, at 5:30 A.M., the defendant agreed to talk with police. He voluntarily waived his Miranda rights and gave the police a full statement, admitting that he shot Pamela, Kimberly, and Nekeya. He stated that he bought the gun several months before the shooting to kill himself, that he felt "hurt and rejected by everybody," that he felt "mistreated and shamed" by his boss, and that "the shots [he] fired tonight should have been for them because of the way they treated [him] in the past."

1. At the close of the evidence, the defendant requested and was denied a jury instruction regarding lack of criminal responsibility.[5] Such an instruction must be given if requested and supported by the evidence. *Commonwealth* v. *Laliberty*, 373 Mass. 238, 244 (1977). Expert testimony is not required to raise the issue,[6] but rather it may be raised by "the admission of any evidence which, if believed, might create a reasonable doubt concerning the defendant's criminal responsibility at the time of the killings." *Id.* at 246-247. Lack of criminal responsibility in this Commonwealth requires the existence of

---

[4] Pamela was hospitalized for over three months recovering from gunshot wounds.

[5] The judge properly instructed the jury they could consider any mental impairment when determining whether the defendant deliberately premeditated or was able to form the specific intent to kill with malice. See *Commonwealth* v. *Grey*, 399 Mass. 469, 470-472 (1987).

[6] The defense called no witnesses. Although the judge approved the appropriation of funds for psychiatric experts, there is no evidence in the record whether any psychiatric examinations took place.

a mental disease or defect, which causes a defendant's lack of substantial capacity either to appreciate the wrongfulness of his or her conduct, or to conform his or her conduct to the requirements of the law. *Commonwealth* v. *McHoul*, 352 Mass. 544, 546-547 (1967). Where there is evidence to raise the issue, the Commonwealth bears the burden to prove the defendant's criminal responsibility beyond a reasonable doubt. *Id.* at 548.

The judge properly refused to instruct the jury on the issue of criminal responsibility. Nevertheless, the defendant points to the following evidence to support his contention that he lacked criminal responsibility at the time of the crime. Pamela Watkins testified that her prior relationship with the defendant was not marked by violence and that on the day of the killing he appeared to be a different person from the one she had known.[7] Also, the defendant argues that his behavior

---

[7]The colloquy between Pamela and defense counsel was as follows:

DEFENSE COUNSEL: "In the early morning hours of January 28th, when you saw [the defendant] in your room, did it appear to you at that point he was crazy?"

THE WITNESS: "No."

DEFENSE COUNSEL: "Did it appear to you that he had snapped?"

THE WITNESS: "No."

DEFENSE COUNSEL: "He just seemed the normal [the defendant] to you?"

THE WITNESS: "Very angry."

DEFENSE COUNSEL: "Just an angry version of [the defendant]?"

THE WITNESS: "Very angry. Very angry. Mad."

DEFENSE COUNSEL: "Well, mad like foaming at the mouth mad?"

THE WITNESS: "No."

DEFENSE COUNSEL: "Just angry?"

THE WITNESS: "Yes."

DEFENSE COUNSEL: "Well, isn't it fair to say that the [the defendant] that you knew, lived with, had a relationship with, shared your home with, prior to the early morning hours of January 28th of 1992 could not have done what he did?"

THE WITNESS: "I don't know."

DEFENSE COUNSEL: "Well, didn't it appear to you that he just snapped? Didn't he appear to be a completely and totally different person than the person you knew?"

THE WITNESS: "It appeared."

DEFENSE COUNSEL: "It did appear?"

THE WITNESS: "Yes."

was an illogical response to the issuance of a protective order, especially since he should have realized he would be the primary suspect in the crimes. Finally, the defendant claims, the evidence showed he was suicidal and had engaged in a "bizarre, illogical, and crazy" pattern of behavior. This evidence, the defendant claims, raised the issue of criminal responsibility.

None of these facts, if believed by the jury, alone or in combination with the others, implicates a lack of criminal responsibility at the time of the crimes. There is no evidence that the defendant suffered from a prior mental illness or was hospitalized. See *Commonwealth* v. *LaPlante*, 416 Mass. 433, 443 n.13 (1993), and cases cited. Suicidal ideation, absent more, is an insufficient basis for a finding of lack of criminal responsibility. *Commonwealth* v. *McInerney*, 373 Mass. 136, 152 (1977). Cf. *Commonwealth* v. *Mills*, 400 Mass. 626, 630-631 (1987) (suicidal attitude, combined with failure to remember stabbing the victim, telling arresting officer to shoot him, and walking into on-coming traffic sufficient to warrant jury charge). The bizarre or inexplicable nature of a crime alone does not provide a foundation for an insanity defense. *Commonwealth* v. *LaPlante, supra* at 443-444.[8] *Commonwealth* v. *Mattson*, 377 Mass. 638, 644 (1979). The record reveals that the defendant was calm and lucid both before and after the crimes. He understood and responded appropriately to the officers' questions at the house prior to being placed in protective custody, during protective custody, while being taken to the apartment to retrieve his belongings

---

[8]*Commonwealth* v. *LaPlante*, 416 Mass. 433 (1993), was decided one year after the defendant's trial. The proposition for which it stands, i.e., that the bizarre nature of a crime is not, in itself, a sufficient basis for charging a jury on lack of criminal responsibility, is not a new development in our law. Although we suggested in past cases that the facts of a crime themselves may "create an inference of mental disease or defect," *Commonwealth* v. *Laliberty*, 373 Mass. 238, 245 (1977), quoting *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 765 (1977), we noted two years later, well before the defendant's trial, that we were unaware of "any case where the inexplicableness of a crime alone raises a jury issue of insanity." *Commonwealth* v. *Mattson*, 377 Mass. 638, 644 (1979). Again, in 1990, we stated "[t]hat the crimes were heinous would not alone support a conclusion that they were the product of an insane mind." *Commonwealth* v. *Freeman*, 407 Mass. 279, 286 (1990). Further, the manner in which the defendant committed the crimes is not so bizarre as to, in itself, suggest insanity.

shortly before the crimes, and when arrested. That he understood the wrongfulness of his actions is demonstrated by the fact 'that he parked his vehicle around the corner so it would not be seen by police. He entered through the back of the house so as not to be seen by neighbors. He stated that he shot at his daughter because he did not want her to be a burden to anyone, and shot Kimberly Watkins "because she was there." He fully recalled the details of the crime and made a complete and coherent statement to the police. Contrast *Commonwealth* v. *Mills, supra* at 630 (defendant had no memory of stabbing victim); *Commonwealth* v. *Laliberty*, 373 Mass. 238, 246 (1977) (defendant did not remember crime and felt like he was "floating" and "hallucinating"). There is simply no evidence of lack of criminal responsibility in this case. There was no error in the judge's ruling.

2. The defendant contends that the judge's instruction on malice unconstitutionally diluted the standard of proof required for a conviction of murder in the first degree.[9] We do not agree.

Malice as an element of murder may be proved by evidence establishing any one of three facts beyond a reasonable doubt: The defendant, acting without justification or legal excuse, must (1) intend to kill the victim, (2) intend to cause grievous bodily harm,[10] or (3) act such that in the circumstances known to the defendant, a reasonably prudent person would know

---

[9]The judge instructed the jury that "[m]alice aforethought includes any unexcused specific intent to kill or unexcused specific intent to do grievous bodily harm, or unexcused intent to do an act creating a plain and strong likelihood that death will follow. If in the circumstances known to the defendant a reasonably prudent person would have known that according to common experience there was a plain and strong likelihood that death would follow the contemplated act, malice may be inferred without any actual intent to kill or do grievous bodily harm. Malice aforethought refers to a frame of mind which includes not only anger, hatred and revenge, but also every other unlawful and unjustifiable motive. It is an intent to inflict grievous bodily injury or harm without legal justification. Whether a killing is actually committed with malice aforethought is determined from the nature and the quality of the act which attends the killing. If the circumstances attending a killing disclose that death flows from a purposeful, selfish, wrongful motive, as distinguished from the frailty of human nature, then there can be malice aforethought . . . ."

[10]The defendant argues, for the first time on appeal and in a footnote in his brief, that "the charge 'It is an intent to inflict grievous bodily *injury or harm*' is at best ambiguous" (emphasis added). Such an assertion does not rise to the level of appellate argument and we do not address it here.

that, according to common experience, there is a plain and strong likelihood that death will follow the contemplated act. *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987).

The judge began his charge with the proper instruction on the three prongs of malice as outlined in *Commonwealth* v. *Grey, supra.* In addition to the standard, approved *Grey* charge, however, the judge instructed that "[i]f the circumstances attending [the] killing disclose that the death follows from a purposeful, selfish, wrongful motive as distinguished from the frailty of human nature, then there can be malice aforethought." We have since cautioned against the use of this language. See *Commonwealth* v. *Torres*, 420 Mass. 479, 487 (1995); *Commonwealth* v. *Eagles*, 419 Mass. 825, 836 (1995). In *Commonwealth* v. *Eagles, supra*, we acknowledged that the above language might lead a jury to believe that a selfish, wrongful mood might be enough to show malice. Rather, we stated, malice should be defined "by reference to the three prongs described in *Commonwealth* v. *Grey, supra*, with such additional explanation as may be appropriate to the understanding of those concepts." *Id.* We conclude here, nonetheless, that in the context of the judge's entire charge, the above-quoted language did not create reversible error.

In determining the propriety of a jury instruction on appeal,[11] we consider the instruction "in the context in which it was delivered, in order that we might determine its probable effect on the jury's understanding of their function" (citations omitted). *Commonwealth* v. *Adrey*, 397 Mass. 751, 753-754 (1986). The judge clearly and properly laid out the *Grey* charge. He repeatedly stressed that the Commonwealth carried the burden to prove beyond a reasonable doubt each element of the crimes charged. Further, the judge instructed that the jury could consider the effect of intoxication or mental impairment on the defendant's ability to form a specific intent to kill. The jury were properly instructed on

[11]The defendant, at sidebar following the charge, stated to the judge, "I think that when malice is defined now — the reality is malice is one of three things: Intent to kill, intent to do grievous injury, and the circumstances known to the defendant, a strong and plain likelihood. And so the part of the charge that expands malice — this is my view of it — it expands malice beyond those three elements, I object." The defendant properly preserved his appellate rights.

the three prongs of malice. In the context of the over-all charge, the extraneous language, although disapproved, did not constitute reversible error.

3. The defendant claims it was error for the judge to deny his motion to suppress a statement that he made after his arrest but before he was booked and advised of his right to make a telephone call pursuant to G. L. c. 276, § 33A. The defendant's booking was delayed until the arresting officers, the Medford police, and the State police were all present almost two hours after the defendant was arrested. During that time, the defendant remained handcuffed to a wall and was not questioned. When he saw Lieutenant Longo, the defendant asked him, "[Lieutenant], can I talk to you? I think I screwed up."

Unfavorable evidence gained as a result of an intentional deprivation of a defendant's right to make a telephone call pursuant to G. L. c. 276, § 33A, should be suppressed. *Commonwealth* v. *Jones*, 362 Mass. 497, 502-503 (1972). That statute provides that "[t]he police official in charge of the station . . . shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney." The police are to inform the arrested person of the right "forthwith upon his arrival" at the station, and "such use shall be permitted within one hour thereafter." G. L. c. 276, § 33A. Suppressing evidence obtained as a result of an intentional violation of the statute is intended to make the legislation effective in the absence of an express penalty for a violation. We have not extended the policy to unintentional deprivations by the police. *Commonwealth* v. *Parker*, 402 Mass. 333, 341 (1988), *S.C.*, 412 Mass. 353 (1992), and 420 Mass. 242 (1995). *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 266 (1982). The delay here was not designed to gain inculpatory information but to allow the officers involved to be present at booking. The defendant was not questioned during that time but simply made to wait for the officers' arrival. The judge found, after hearing, that there was no intentional delay. His finding is warranted by the evidence. The judge did not err in refusing to suppress the defendant's statement.

4. The defendant did not ask this court for relief pursuant

to G. L. c. 278, § 33E. Nonetheless, we have reviewed the entire record, and conclude that the interests of justice do not require a reduction in the murder verdict or a new trial.

*Judgments affirmed.*