## COMMONWEALTH vs. SEAN SEABROOKS.

Hampshire. May 5, 1997. - July 21, 1997.

Present (Sitting at Springfield): WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR, GREANEY, FRIED, & MARSHALL, JJ.

*Evidence,* Hearsay, State of mind. *Homicide. Practice, Criminal,* Instructions to jury. *Insanity.*

At a murder trial, where the Commonwealth improperly was permitted to introduce the victim's hearsay statement that the defendant had caused certain injuries visible on the victim some seventeen months before the murder, it was error to exclude evidence proffered by the defendant of the victim's recantation of the allegation; where the only issue in the case was the degree of the defendant's culpability, the testimony invited the jury to base their decision on that issue on inadmissible hearsay: a new trial was required. [509-513]

At the trial of an indictment for murder in the first degree, the judge correctly declined to instruct the jury on voluntary manslaughter, where the evidence was insufficient to establish adequate provocation to warrant such an instruction [513-515]; further, the judge did not err in refusing to instruct the jury on lack of criminal responsibility where there was not sufficient factual basis to warrant it [515-517].

INDICTMENTS found and returned in the Superior Court Department on January 27, 1993.

The cases were tried before *John F. Murphy, Jr.,* J.

*Richard M. Passalacqua* for the defendant.

*Judith Ellen Pietras,* Assistant District Attorney, for the Commonwealth.

ABRAMS, J. After trial by jury, the defendant, Sean Seabrooks, was convicted of murder in the first degree by reason of deliberate premeditation and extreme atrocity or cruelty for the killing of his former female companion and their child. On appeal, the defendant argues that he was deprived of his right to present a full and fair defense by the judge's improper exclusion of evidence. The defendant argues that the excluded evidence was relevant and admissible to rebut hearsay evidence introduced by the Commonwealth. We agree. We reverse and remand for a new trial. Because there must be a retrial, we comment briefly

on the defendant's claim that the judge should have instructed the jurors on voluntary manslaughter and insanity.

We summarize the evidence as follows. On the evening of January 11, 1993, a coworker of the defendant notified the Northhampton police that the defendant had telephoned to report that he would not be into work the following day. The defendant told the coworker that he had just killed his friend, Sherry Morton, and their infant child, Cedric Seabrooks. The defendant started crying and said that he had "really 'F'-ed up."

Police officers went to Morton's apartment and found the two victims on the bedroom floor. The hilt of a knife was protruding from Morton's cheekbone. Forensic examination revealed that she had been stabbed more than fifty times. Forty-two stab wounds on her shoulders, arms, and hands indicated that she vigorously attempted to defend herself. Cedric Seabrooks was lying next to his mother. He had been stabbed eleven or twelve times.

At approximately the same time, the defendant's father notified Springfield police officers that the defendant may have seriously hurt his friend, Sherry Morton, and their child, Cedric. The responding officers saw the defendant walking along the street. The officers called to the defendant. He changed direction, but kept walking and talking to himself. He was repeating statements such as "it's over," that "they were gone," that "it was too late," and he mentioned a knife. For their safety, the officers asked the defendant the location of the knife. The defendant replied that the knife was in Morton's head. The officers tried to ascertain the victims' address so they could dispatch an ambulance. The defendant was only partially responsive. After repeated inquiries, the defendant gave Morton's address. The officers then took the defendant into custody.

At the police station, the defendant related his account of the evening's events. The defendant said that he and Morton recently had separated. He went to Morton's apartment that evening to play with his child and to give Morton some money for child support. The defendant said that Morton accused him of being intoxicated, they began arguing, and she told him to leave. Morton told the defendant that he would never see his child again. She tried to call the police. The defendant said that he "just couldn't take it anymore," and he grabbed the phone and pulled it off the wall. He said that he "freaked out," "lost control," and grabbed a knife from the dishwasher. While wav-

ing the knife at Morton, he accidently cut the child. The defendant apologized to Morton, but she was screaming at him. The defendant admitted that he then ran after the victims into the bedroom and stabbed them. He said that he stabbed Morton only three or four times, and the child once.

The defendant told the police that, after the killings, he attempted to commit suicide. He brought several electrical appliances into the bathroom and plugged them into the outlet, but none of the cords would reach into the bathtub.[1] He then returned to the bedroom and made some telephone calls. He arranged to meet his cousin in Springfield, and he explained what he had done. She and the defendant then gathered with other friends and family members. The Springfield police were called and the defendant was arrested.

Several officers testified that, during that evening, the defendant did not appear to be under the influence of alcohol or drugs. Two officers did detect a faint odor of alcohol on the defendant's breath. After inquiry, the defendant explained that he had "two shots" of alcohol earlier in the evening, but said that he was not under the influence of alcohol or drugs. The defendant agreed to let the police search his car. They found an extension cord in the front seat.

The father described the defendant's behavior after the killings as follows. The defendant told his father that he had messed up, but he would not give complete answers to his father's ensuing questions. The defendant was "working his hands up and down," and he "didn't make any sense . . . wasn't himself . . . looked very incoherent, nervous, like he had no control over himself." The defendant's eyes were "real sharp and bright like he was out of it." The father also said that he did not detect any alcohol on the defendant or "sense any intoxication."

A. *Excluded evidence.* The Commonwealth introduced evidence from a friend of the victim that, in September, 1991, she saw several bruises on Morton. The witness said that Morton told her that the defendant inflicted those injuries. She drove Morton to the police station so that Morton could take out a criminal complaint against the defendant. Prior to this statement being admitted, defense counsel objected for the

---

[1]The responding police officers observed several electrical appliances in the bathroom sink. Two of these items were plugged into electrical outlets. There were also appliances in the bathtub.

reason that the statement was hearsay.[2] Defense counsel also informed the judge that he had evidence that Morton's statement to this witness (and to the police) was false and that Morton later retracted the hearsay statement under oath at the trial on the criminal charges. He alerted the judge that, if the Commonwealth's witness was permitted to testify that the defendant was the source of Morton's injuries, the defendant would call a witness who heard Morton retract that statement during the criminal trial and while under oath. The judge overruled the defendant's objections and allowed the Commonwealth to introduce the victim's statement, not to prove its truth, but to show the relationship between the parties and "their state of mind."[3]

As promised, during the defendant's direct case, the defendant offered testimony from his former defense counsel on the earlier criminal charges. The defendant made an offer of proof that, in private conversation with prior defense counsel and then later, under oath at trial, the witness heard Morton recant her previous statement that the defendant was the source of her injuries. The Commonwealth objected on the ground that the proffered testimony of the private conversation with prior defense counsel and his recitation as to the victim's testimony in the earlier court proceeding was "unadulterated" hearsay. The judge excluded the evidence. Because the Commonwealth improperly was permitted to introduce the victim's hearsay statement as to the source of her injuries, it was error not to let the defendant present evidence of the victim's recantation of that allegation.[4]

The judge admitted the victim's statement for the limited purpose of showing the hostile relationship and state of mind of the victim and of the defendant. "An extrajudicial statement of a declarant is not ordinarily admissible if it is a statement of memory or belief to prove the fact remembered or believed." *Commonwealth* v. *Lowe*, 391 Mass. 97, 104, cert. denied, 469

---

[2]He also objected because the statement was too remote in time to be admissible.

[3]On cross-examination of the witness, defense counsel elicited more of the victim's hearsay statements recounting the alleged assault and battery in greater detail. Defense counsel apparently did so with the intention of introducing in his direct case the victim's subsequent recantation.

[4]To the extent that the excluded evidence recounted the victim's prior recorded testimony, given under oath and subject to cross-examination, it was not hearsay and was admissible to prove the truth of what it asserted. See *Commonwealth* v. *Cyr*, *ante* 89, 97 (1997), and cases cited.

U.S. 840 (1984), citing *Shepard* v. *United States*, 290 U.S. 96 (1933). See *Commonwealth* v. *Andrade*, 422 Mass. 236, 239 (1996) (murder victim's statements that defendant had beaten her and engaged in other misconduct held hearsay and inadmissible); *Commonwealth* v. *Zagranski*, 408 Mass. 278, 282-283 (1990) (victim's statements held inadmissible under the state-of-mind exception because statements concerned only past events).

The victim's statement at issue did not fall within the state-of-mind exception to the hearsay rule. *Lowe, supra* at 104-106, citing *Commonwealth* v. *Borodine*, 371 Mass. 1 (1976), cert. denied, 429 U.S. 1049 (1977). See *Commonwealth* v. *Qualls*, *ante* 163, 167 (1997) ("The state-of-mind exception to the hearsay rule calls for admission of evidence of a murder victim's state of mind as proof of the defendant's motive to kill the victim when . . . there also is evidence that the defendant was aware of that state of mind at the time of the crime and would be likely to respond to it"). In *Lowe* and *Borodine*, the murder victim's statements were declarations of future intent to break off a relationship with the defendant. There, the jury could infer that the victim communicated that intention to the defendant, and the statements were material on the issue of the defendant's motive for killing the victim. Those circumstances are not presented here.[5]

The Commonwealth misconstrues our case law as generally allowing the admission of hearsay statements of past violence or misconduct for the purpose of showing the "hostile relationship between the defendant and the victim." See, e.g., *Commonwealth* v. *Hunter*, 416 Mass. 831, 837 (1994); *Commonwealth* v. *Gil*, 393 Mass. 204, 215, 217-218 (1984). An examination of our cases reveals that we have not construed the state-of-mind exception to sweep so broadly. Hearsay statements which relate the defendant's prior violence or misconduct

---

[5]However, a coworker did testify that, hours before the killings, Morton said that she and the defendant were fighting about child support. Morton did not want the defendant to see the child until the defendant gave her some child support. That statement was admissible under the state-of-mind exception. The evidence indicates that the victim communicated to the defendant her intention of requiring support in order for him to see the child, and therefore it was relevant to the defendant's motive for killing her. See *Commonwealth* v. *Lowe*, 391 Mass. 97, 104-106, cert. denied, 469 U.S. 840 (1984); *Commonwealth* v. *Borodine*, 371 Mass. 1, 7-8 (1976), cert. denied, 429 U.S. 1049 (1977).

are probative of the relationship only if they are considered as proof of the facts remembered or believed.[6]

Allowing hearsay statements generally under the state-of-mind exception would entirely eviscerate the hearsay rule and its important purpose of securing the correctness and completeness of testimony through cross-examination. See *Shepard, supra* at 105-106 ("[hearsay] declarations of intention, casting light upon the future, have been sharply distinguished from declarations of memory, pointing backward to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored. The [hearsay] testimony now questioned faced backward and not forward. This at least it did in its most obvious implications. What is even more important, it spoke to a past act, and more than that, to an act by some one not the speaker. Other tendency, if it had any, was a filament too fine to be disentangled by a jury"); *Commonwealth v. Del-Valle*, 351 Mass. 489, 494-495 (1966) ("These limitations are necessary to preserve the hearsay rule; without them statements of past events could be used as evidence of the occurrence of the events merely by a process of circuitous reasoning and the rule would be absorbed by the exception"). See also McCormick, Evidence § 245, at 728 (1984).

We next consider whether the improper admission, and improper exclusion, of evidence weakened the defendant's case in some significant way so as to require a retrial. See *Commonwealth v. Cyr, ante* 89, 95 (1997), citing *Commonwealth v. Daggett*, 416 Mass. 347, 352 n.5 (1993), and *Commonwealth v. Schulze*, 389 Mass. 735, 741 (1983). The defendant did not deny killing the victims. The critical issue was the defendant's degree of culpability. On that issue, the jury could have been influenced by the judge's erroneous evidentiary rulings which significantly skewed that evidence against the defendant.[7]

The jurors were left with the impression that the victim said

_____

[6]Of course, the testimony of a witness who has observed the defendant's prior bad acts toward a murder victim is not hearsay and properly is admissible to show the relationship of the parties. See, e.g., *Commonwealth v. Andrade*, 422 Mass. 236, 239-240 (1996); *Commonwealth v. Gil*, 393 Mass. 204, 215-217 (1984). One of Morton's friends did testify that, on a prior occasion, he observed the defendant threaten to strike the victim with a lamp. His testimony was admissible as evidence of the hostile relationship between the parties and could be considered for its truth. See, e.g., *Andrade, supra*; *Gil, supra.*

[7]We comment briefly on other testimony admitted to show the relationship of the parties and the victim's state of mind. Over the defendant's specific

that the defendant caused her injury on a prior occasion, but they did not hear that the victim later said that that allegation was not true. In addition, the jurors heard hearsay evidence of the victim's fear of the defendant and of his attempts to control the victim in the past. See note 6, *supra.* This was not a case where there was considerable properly admitted evidence bearing on the relationship between the victim and the defendant. Therefore, a new trial is required. Compare *Andrade, supra* at 240 (new trial not required where "ample other evidence of threats, acts of physical violence, marital discord, and suspicions of infidelity" rendered "the erroneously admitted evidence cumulative on the points of the defendant's intent and his state of mind"). "The hearsay testimony of [the victim's] statements [and her fear of the defendant] invited the jurors to base their decision on the degree of the defendant's culpability [the only issue in the case] on inadmissible hearsay." *Cyr, supra* at 94.

B. *Other issues likely to recur at a new trial.* We turn to other issues raised on appeal which may recur on retrial.

1. *Voluntary manslaughter.* The defendant claims that the excluded testimony supported his claim of provocation. The defendant asserts that, on a prior occasion, the victim falsely accused the defendant of violence so as to punish or hassle him. The defendant said that just before the killings, he and Morton argued. She said that he would never see his child again, and she attempted to call the police. The defendant contends that the excluded evidence of the prior false accusation and her threat to telephone the police constituted adequate provocation. That

objection on hearsay grounds, a coworker testified that the victim told her that she was concerned that the defendant had a key to her apartment. This statement is at best only relevant to show the victim's fear of the defendant and should not have been admitted. See *Commmonwealth* v. *Qualls, ante* 163, 169 (1997); *Commonwealth* v. *Cyr, ante* 89, 93-94 (1997), and cases cited.

Another coworker testified that the victim "had mentioned . . . that she was afraid for herself and [the child], and she was scared that something may happen; [the defendant] may cause trouble or do something of harm." A murder victim's expressions of fear of the defendant are not relevant to or probative of the defendant's motive to kill her, and therefore are not admissible in the defendant's trial for murder. See *Qualls, supra*; *Cyr, supra.*

A coworker of Morton's also said that he asked Morton why she did not go out with him on New Years' Eve. Morton told him that the defendant had taken her automobile keys and would not let her go out. Again, this statement of past memory or belief was hearsay and inadmissible. *Andrade, supra* at 239; *Commonwealth* v. *Zagranski,* 408 Mass. 278, 282-283 (1990); *Lowe, supra* at 105.

provocation would warrant the jury in concluding that the defendant killed the victims in the heat of passion. Therefore, the defendant contends that the jurors should have been permitted to consider whether voluntary manslaughter was the appropriate degree of culpability. The judge correctly declined to instruct the jurors on voluntary manslaughter.[8]

A jury instruction on voluntary manslaughter is warranted "if there is evidence of provocation deemed adequate in law to cause the accused to lose his self-control in the heat of passion, and if the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." *Commonwealth v. Schnopps*, 383 Mass. 178, 180 (1981), *S.C.*, 390 Mass. 722 (1984). "A jury must be able to infer that a reasonable person would have become sufficiently provoked, and that the defendant was in fact provoked." *Commonwealth v. Pierce*, 419 Mass. 28, 31 (1994). "Insults and quarreling alone cannot provide a reasonable provocation." *Commonwealth v. Callahan*, 401 Mass. 627, 632 (1988), quoting *Commonwealth v. Zukoski*, 370 Mass. 23, 28 (1976). See *Commonwealth v. Carrion*, 407 Mass. 263, 267 (1990).

Viewed in the light most favorable to the defendant, see *Schnopps*, *supra* at 179, we conclude that the evidence is insufficient to establish adequate provocation for a manslaughter instruction. Morton's threat and attempt to call the police, if construed as manifesting an intent to falsely accuse the defendant, is different from other cases in which we have held words alone to be insufficient provocation. See *Commonwealth v. Bermudez*, 370 Mass. 438, 441 (1976) ("A reasonable man can be expected to control the feelings aroused by an insult or an argument, but certain incidents may be as provocative when disclosed by words as when witnessed personally"). See also *Schnopps*, *supra* at 181-182. However, Morton had asked the defendant to leave her home. She was entitled to call the police upon his refusal to do so. See *Callahan*, *supra* at 632 (defendant's argument with victim and victim's intention to "throw [him] out" of their apartment held insufficient provocation to warrant manslaughter charge). Even if Morton's attempt to call the police were unjustified, "it was not the type of

---

[8]In his brief the defendant insufficiently argues and cites no authority to support his theory of provocation. See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975). Nevertheless, we express our view because the issue may arise on retrial.

behavior that would provoke a reasonable person into a homicidal response." *Pierce, supra* at 32. The facts do not warrant a charge on voluntary manslaughter.

2. *Insanity instruction.* The defendant contends that the judge's refusal to instruct the jury on insanity constituted reversible error.[9] "An insanity defense may be raised properly by the admission of any evidence which, if believed, might create a reasonable doubt concerning the defendant's criminal responsibility at the time of the [crime]." *Commonwealth* v. *Mills,* 400 Mass. 626, 627 (1987), quoting *Commonwealth* v. *Laliberty,* 373 Mass. 238, 246-247 (1977). Lack of criminal responsibility requires the existence of a mental disease or defect, which causes the defendant to lack the substantial capacity either to appreciate the wrongfulness of his or her acts, or to conform his or her conduct to the requirements of the law. *Commonwealth* v. *McHoul,* 352 Mass. 544 (1967). Once the evidence is sufficient to raise the issue of insanity and an instruction is requested, the refusal of that request is reversible error. *Commonwealth* v. *Monico,* 396 Mass. 793, 803 (1986).

The defendant argues that insanity was raised by the following evidence: the nature of the crime itself, his alleged suicide attempt, and his "erratic" behavior after the killings. The defendant also argues that his statements to the police that "he freaked out" and "lost control," and his underestimation of the

---

[9]The defendant also summarily asserts error in the judge's failure to instruct on mental impairment. However, he does not argue the issue in his brief. See Mass. R. A. P. 16 (a) (4). The record indicates that the defendant's request for that instruction was based, at least in part, on a claim of voluntary intoxication. See *Commonwealth* v. *Sama,* 411 Mass. 293, 298 (1991) (a defendant's intoxication "bears on the defendant's ability to possess the requisite knowledge of the circumstances in which he acted" and is relevant to whether "the Commonwealth has proved the knowledge aspect of malice aforethought under the third prong [of malice]").

Although the defendant claimed that Morton accused him of being intoxicated, he told the police he had had "two shots" and was not intoxicated. Several police officers and the defendant's father all said that the defendant did not appear to be intoxicated. "While there was evidence of the consumption of alcohol, there was no evidence of debilitating intoxication that would have hindered the defendant from comprehending that he was stabbing the victim[s]." *Andrade, supra* at 245-246. See *Commonwealth* v. *Cowels, ante* 279, 291 (1997) ("Although there was some evidence that the defendants had been drinking and had shared a marihuana cigarette, there was no evidence that they were so intoxicated that they lacked awareness of their actions" [footnote omitted]). There was no error in not instructing on mental impairment based on voluntary intoxication. *Andrade, supra* at 246.

number of stab wounds inflicted, support the inference that the argument with Morton was a "triggering event" between sanity and insanity. The defendant also asserts that, from the excluded evidence, the jury could infer that Morton's "baseless threats" "pushed him into an insane state of mind" or "triggered a temporary period of insanity." We do not agree with the defendant's assertions.

None of these facts, taken alone or in combination with each other, is sufficient to implicate a lack of criminal responsibility at the time of the crimes. See *Commonwealth* v. *Johnson*, 422 Mass. 420, 425-426 (1996). "That the crimes were heinous would not alone support a conclusion that they were the product of an insane mind." *Commonwealth* v. *LaPlante*, 416 Mass. 433, 443-444 (1993), quoting *Commonwealth* v. *Freeman*, 407 Mass. 279, 286 (1990). Even if believed, a suicidal attitude does not in itself provide a sufficient basis to warrant an insanity charge, and may be merely an indication of "the efforts of a guilty person to avoid punishment for his crime." *Commonwealth* v. *McInerney*, 373 Mass. 136, 152 (1977), quoting *Commonwealth* v. *Goldenberg*, 315 Mass. 26, 33 (1943). See *Johnson*, *supra* at 426. Cf. *Mills*, *supra* at 630-631.

Although expert testimony is not required to raise the issue of insanity, see *Johnson*, *supra* at 424, something more than the defendant's own characterizations that he "freaked out" and "lost control" is required. See *Commonwealth* v. *Mattson*, 377 Mass. 638, 643-644 (1979) (bizarre behavior and dramatic personality change insufficient to warrant a finding of insanity under the *McHoul* prerequisites). Here there is no evidence, from lay persons or otherwise, that the defendant suffered from prior mental illness or had been hospitalized. See *Johnson*, *supra* at 426. Cf. *Mills*, *supra* at 630 (defendant had a history of alcoholism); *Monico*, *supra* at 800-801 (defendant had a history of head injuries); *Commonwealth* v. *Genius*, 387 Mass. 695, 698 (1982) (defendant suffered from extreme depression and agitation); *Commonwealth* v. *Laliberty*, 373 Mass. 238, 246 (1977) (defendant was a habitual drug user with marginal intelligence).

Moreover, promptly after the crimes, the defendant told several people that he had killed the victims. That he understood the wrongfulness of his actions is manifested by his statement that he apologized to Morton for cutting the child, and his statements to others that he had " 'F'-d up," that is, that he had messed up. See *Johnson*, *supra* at 427. At the police station the defendant was

calm, lucid and responsive, although he did cry while giving his statement. He fully appeared to understand the officers, and the police had no difficulty understanding him. The defendant gave the police a detailed account of the evening's events, answered questions directly and with detail, and he made corrections when his written statement was read back to him. Cf. *Mills, supra* at 630 (defendant's mind went blank and he had no memory of stabbing victim); *Genius, supra* at 698 (defendant heard a click and did not remember stabbing victim); *Laliberty, supra* at 246 (defendant remembered walking on driveway, felt like he was "floating" and "hallucinating," and had no memory of his conduct after entering victims' premises). The defendant's self-serving statement underestimating the number of stab wounds is unremarkable. See *Andrade, supra* at 242. There was insufficient evidence to warrant an instruction on criminal responsibility.

The judgments are reversed, the verdicts are set aside, and the case is remanded to the Superior Court for a new trial.

*So ordered.*