Cowin, J.
The defendant, Carlo Gonzalez, is charged with burglary (G.L.c. 266, §14), aggravated rape (G.L.c. 265. §22(a)) and a number of other offenses all arising from the same incident. He has moved to suppress certain statements made to the police on the ground that they were the fruit of an unlawful arrest and made in violation of the requirements of Miranda v. Arizona, 384 U.S. 436 (1966). Specifically, as to his arrest, the defendant claims that he was illegally arrested at his home when the police had no warrant for his arrest. Any statements made thereafter should thus be suppressed as “fruit of the poisonous tree.” Wong Sun v. United States, 371 U.S. 471, 484-88 (1963). In regard to his Miranda rights, the defendant maintains that he does not recall the police ever advising him of these rights and that, even if they did so, he did not understand them because he speaks virtually no English and the rights were not adequately explained to him in Spanish. Defendant also argues that his statements should be suppressed as he was deprived of his right to use a telephone after his arrest in violation of G.L.c. 233, §33A.
A hearing was held on the defendant’s motion on December 4 and 5, 1997. At the hearing, the following witnesses testified: Officer Richard Santiago and Inspector Stephen Beland, both of the Lowell Police Department. After the hearing and evaluation of the credibility of the witnesses, the Court makes the following findings.
FINDINGS OF FACT
Shortly after midnight on April 5-6, 1997. Officer Richard Santiago of the Lowell Police Department and his partner, Officer Douglas Boyle, responded to 53 Ware Street, Lowell, and found three women standing outside the residence. The women were speaking in Spanish. Officer Santiago speaks both Spanish and English.[2] One of the women was tearful, gasping for breath and unable to speak coherently. The women and the officer proceeded into the building and upstairs to the apartment of the woman who was crying. There, the woman became a little calmer and, in Spanish, told the officer that she had just been raped by a man she knew, a neighbor named Carlos, who lived in the building behind her.
The woman told the officer that earlier in the evening some friends had been visiting her and that when they had left they had not locked the door. ’While the woman was in the kitchen cooking, the defendant had startled her by entering her apartment without her knowledge. He had come up behind her in the kitchen and fondled her. Then he took her to the living room and assaulted her. She had gotten away and run back to the kitchen. He followed her, picked a knife up from the kitchen counter and again assaulted her. She fled to her bedroom and managed to leave. The defendant had raped her digitally. The woman pointed out items *61 of clothing that the man had tom off her during the attack. She described the defendant and the fact that he lived in an apartment behind her house. The officer observed that the apartment was in total disarray and that there was a kitchen knife on top of the refrigerator.
The police asked the woman if she could take them to the assailant’s apartment and she said that she could. They walked outside her building and around the side of it to another section of the building. In that section, they entered an open door, proceeded to the second floor and, at an apartment indicated by the victim, knocked on the door and identified themselves as Lowell police officers.
A man opened the door and the police saw another man in a chair approximately three or four feet from the door. At this point, the police were not in fear for their own or anyone else’s safety. The police asked if Carlos were there and the victim, who was standing in the hall behind the police, pointed to the man in the chair and said: “That’s him." Officer Santiago asked the man in the chair to step out to the hall and he did so. The police then arrested that man (the defendant) and transported him to the Lowell Police Department. (Officer Santiago remained at the scene for a short time .to assist in the investigation.)
Upon the defendant’s arrival at the station, a form was presented to the him indicating his right to use the telephone. The time of defendant’s arrival on this form is noted as 12:50 (a.m.). The form states that the defendant was advised of his right to use the telephone to communicate with family, friends, an attorney or to arrange for release on bail. The officer in charge and the defendant signed the form. However, the defendant cannot read or speak English and there is no evidence that anyone translated the information on the form to the defendant at 12:50 or thereabout.
The defendant was then placed in a cell until sometime after 3:00 a.m. when he was brought to the booking desk to be booked. At that time, Officer Santiago assisted in the booking of the defendant, acting as a translator to translate the booking questions and Santiago’s answers to them. It appeared that the defendant understood the questions, as he answered them appropriately. During the booking procedure, Officer Santiago also informed the defendant of his right to use the telephone and asked him if he wished to use the telephone. He replied that he did not.
Officer Santiago then went to the Criminal Bureau and the defendant was returned to a cell. Shortly thereafter, Inspector Stephen Beland took the defendant from his cell to the Criminal Bureau to interview him. In the Criminal Bureau, the defendant was seated at a desk with the two officers on the other side of the desk. Officer Santiago informed the defendant of his Miranda rights in Spanish and asked the defendant if he understood and if he wanted to speak with the police. The defendant appeared to understand what the police were saying and stated that he had nothing to hide and would speak to the police. The officers gave the defendant a card that contained the Miranda warnings in Spanish. The defendant appeared to read this card and the defendant and the two officers signed the card at 4:15 a.m.
Inspector Beland proceeded to ask the defendant questions and Officer Santiago translated the questions. As the defendant responded. Santiago translated the responses. The interview began with the defendant being asked for a description of what had happened that night. He said that he had had nothing to do with the victim, that he had not done anything that night and had not been in the victim’s apartment. Inspector Beland told Officer Santiago to inform the defendant that Beland did not believe him, that the police had spoken to the victim and been informed that Santiago had indeed been in her apartment. Beland stated that if the defendant wanted to tell the truth Beland would take his statement but that if he were going to insist that he was not in the apartment Beland was not going to waste his time. The defendant then changed his story. He said that he had not done anything to the victim and so he would talk to the police. He said that he was at the apartment and that everything that happened between him and the victim was consensual.
Inspector Beland typed the defendant’s statement on a computer. The interview lasted about one hour and, at the end of it, the defendant’s statement was printed out on a hard copy. Officer Santiago read the printed statement to the defendant in Spanish[3] and the defendant nodded his head as if he understood what was being said. He was then given the printed statement and nodded that it was fine and signed it at the bottom. The officers also signed the printed statement. The printed statement does not contain the defendant’s initial remarks that he had not done anything to the victim that night.
A telephone was located on the desk where the statement was taken. The defendant never asked to use the phone or to consult with an attorney. He appeared to understand the questions asked of him and he responded appropriately.
The defendant was informed of his Miranda rights in Spanish by a Spanish-speaking officer and he also read them in Spanish from a printed card. There is nothing to indicate that the defendant did not comprehend his rights.
Although the defendant’s affidavit states that he did not understand his rights because they were not “adequately explained” to him in Spanish, he never maintains that the rights were not given to him in Spanish, simply that he did not understand them. Initially, it should be noted that defendant did not testify. His claims are made only by affidavit. And even in the affidavit defendant admits that a Spanish-speaking officer was present. As to defendant’s contention that he did not comprehend his rights because they were not “adequately explained” to him, he was *62 advised of his rights in Spanish and he was given a card to read with the rights printed in Spanish. Thus, he received more than the requirements of Miranda. He was advised of the rights in his native language both orally and in writing. The words themselves are not difficult to comprehend nor do they embody complex concepts. Further, although the defendant had completed only the third grade, there was no evidence that the defendant was of inferior intelligence. He was a twenty-one year old male who was apparently living independently in an apartment in Lowell. There is no evidence he was under the influence of any substance. Nor was there any evidence of threats or intimidation by the police. Accordingly, I find that the defendant understood his rights. However, even if there were an issue of whether the defendant understood his rights, I do not interpret the holding of Miranda to require the police to provide instruction as to the meaning of the Miranda warnings. See Commonwealth v. Cunningham, 405 Mass. 646 (1989). Thus, I find beyond a reasonable doubt that the defendant was properly advised of his Miranda rights and that the defendant’s statements to the police were made voluntarily after a knowing, willing and intelligent waiver of Miranda rights. Commonwealth v. Tavares, 385 Mass. 140 (1982), cert. denied, 457 U.S. 1137 (1982).
In regard to the use of the telephone, as stated above, the defendant was provided with a form regarding his right to use the telephone upon his arrival at the police station and he signed said form. The form, however, was in English and was not translated into Spanish at that time. Officer Santiago, who spoke Spanish, did not advise the defendant of his right to use the telephone until booking which was at approximately 3:15 a.m. Accordingly, the defendant was not effectively advised of his right to use the telephone until approximately 3:15 a.m. There is nothing to indicate that this delay by the police was intentional, however, or that it was done to deprive the defendant of the opportunity to call anyone. Indeed, the defendant was not questioned at all during the interval between his arrival at the station and the booking process. It was only after the defendant was booked and informed of his right to use the telephone that he was questioned at all.
DISCUSSION
Defendant argues that any statements he made must be suppressed as they are the product of an illegal arrest, thus “fruit of the poisonous tree.” Wong Sun v. United States, supra, at 484-88. When police enter a dwelling to make an arrest, as they did in this case,[4] they must have a warrant. If they do not, two conditions must be met for the entry to be valid: the police must have probable cause to believe the defendant committed the crime and exigent circumstances for the entry must exist. The standard of probable cause in this situation is information “sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." Commonwealth v. Pietrass, 392 Mass. 890, 897-98 (1984), quoting from Beck v. Ohio, 379 U.S. 89, 91 (1964).
There is no question that the police in the instant case had probable cause to believe the defendant had committed the crime. Based upon the woman’s statement and the corroborating evidence of the disarray in the apartment and the knife on the refrigerator, probable cause existed to believe the defendant had raped the woman.
The existence of exigent circumstances presents a more difficult question. “The essence of an exigency is the existence of circumstances known to the police which prevent them from taking the time to obtain a warrant because to do so would thwart the arrest.” Id. at 892, citation omitted. The factors upon which a finding of exigency may be based include a showing that the crime was one of violence or that the suspect was armed, a clear demonstration of probable cause, strong reason to believe that the suspect was in the dwelling, a likelihood that the suspect would escape if not apprehended, whether the entry is peaceable and whether the entry is in the nighttime. The police should also consider how long it would take to obtain a warrant. Id. at 898-99. All the factors which would support a finding of exigency existed in this case, except that there was no likelihood that the suspect would escape if not apprehended.[5] The police could have surrounded the dwelling to prevent the suspect’s escape while the police obtained a warrant. If the suspect had attempted to leave during that interval, the exigency justifying arrest would have occurred. Moreover, if the defendant had left his apartment, the issue of warrantless entry would become moot.
The present fact pattern is very similar to the situation in Pietrass, supra, another case in which an intruder entered a home and raped the occupant. In Pietrass, the police found that although the crime was a violent one, the police believed the intruder was unarmed. Further, the police had no reason to believe that the suspect would escape from the dwelling in which they located him. The Court said, at 892: “Two or three of the officers could have stayed at the house to prevent escape while another obtained a warrant. They had no particular reason to believe that the defendant was likely to attack someone else. There was no reason to believe that the defendant was likely to destroy any evidence. There was no reason to believe that the defendant was even aware of the officers’ presence.” The same is true of the present case. Although the crime was a violent one and the defendant used a knife during the attack, the knife came from and remained at the site of the attack. Thus, there was no reason for the police to believe the defendant was armed after he left the victim’s apartment. Further, the police had no reason to believe he would escape from his apartment or was likely to attack anyone else or to destroy any evidence. There was no reason to believe the defendant was aware of the police presence. Accordingly, as in Pietrass, the Commonwealth has failed to meet its burden of showing the existence of an *63 exigency and the entry into the defendant’s apartment to arrest him was illegal.
Moreover, if the purpose of the warrantless arrest rule is to prevent the police from entering dwellings without a warrant absent truly urgent circumstances, that purpose is accomplished only if in cases such as the present the police are required to obtain a warrant. The police should not be entering people’s homes without a warrant when public (or personal) safety is not jeopardized and the arrest can be accomplished at a later time with a warrant.
The defendant then argues that any statements made at his post-arrest interrogation must be suppressed as “fruits of the poisonous tree.” Wong Sun v. United States, supra, at 484-88. However, not all evidence indirectly obtained as a result of illegal police conduct is to be excluded. Id. at 487-88. Other factors may break the causal connection between the illegal conduct and the evidence later obtained. In regard to a confession (or statements) after an illegal arrest, some of these factors are (1) the giving of Miranda warnings; (2) the temporal proximity of the arrest and the confession (or statements); (3) intervening circumstances; and (4) the purpose and flagrancy of the official misconduct. Commonwealth v. Bradshaw, 385 Mass. 244, 258 (1982), citing Brown v. Illinois, 422 U.S. 590, 602-04 (1975).
Applying the Brown factors in the instant case, the Miranda warnings were given between the time of the illegal arrest and the time the defendant’s statements were made. In addition, three or four hours passed between the arrest and the statements. This time interval compares favorably with those in Commonwealth v. Sylvia, 380 Mass. 180, 184 (1980) (one and one-half hours), and Commonwealth v. Fielding, 371 Mass. 97, 114 (1976) (three hours). In both these cases the Supreme Judicial Court ruled that the confessions were properly admitted even though the arrests were improper. There was an intervening circumstance, i.e., the reading of the Miranda warnings. Finally, the official misconduct was not flagrant and was only for the purpose of arresting an individual whom the police believed had just committed a serious and violent crime. The official misconduct, the incorrect determination of an exigency, is a close question in this case. The fact that the police made what this Court believes, in hindsight, to have been the “wrong call,” indicates that the degree of misconduct was slight indeed. According to the Brown factors, the statements were independent of the illegal arrest and the taint of that arrest does not require the suppression of the statements later made. Commonwealth v. Pietrass, supra, at 903.
The defendant also argues that the statements made by him should be suppressed because the Commonwealth has not proved that they were preceded by the giving of Miranda rights; that even if such rights were given, they were not given in Spanish; and that the defendant was not told of his right to make a telephone call in violation of G.L.c. 276, §33A. As I have concluded above, the police gave the defendant his Miranda warnings in Spanish both orally and in writing. The defendant indicated that he understood these warnings by nodding to the police and by signing the Spanish version of the rights. I have found beyond a reasonable doubt that the defendant was properly advised of his Miranda rights, and that the defendant’s statements to the police were made voluntarily after a knowing, willing and intelligent waiver of Miranda rights. Commonwealth v. Tavares, 385 Mass. 140 (1982), cert. denied, 457 U.S. 1137 (1982).
Finally, the defendant claims that his statements should be suppressed because he was denied the right to make a telephone call. G.L.c. 276, §33A provides as follows: “The police official in charge of the station or other place of detention having a telephone wherein a person is held in custody, shall permit the use of the telephone, at the expense of the arrested person, for the purpose of allowing the arrested person to communicate with his family or friends, or to arrange for release on bail, or to engage the services of an attorney. Any such person shall be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone, and such use shall be permitted within one hour thereafter.” In order to effectuate the purpose of the legislation, unfavorable evidence obtained as a result of an intentional deprivation of a defendant’s right to make a telephone call should be suppressed. Commonwealth v. Jones, 422 Mass. 420 (1972); Commonwealth v. Johnson, 422 Mass. 420, 429 (1996). The appellate courts have not, however, extended the remedy of suppression to unintentional deprivations by the police. Id. I have not found that there was any intentional deprivation in this regard. Thus, the defendant’s statements should not be suppressed for this reason. See Commonwealth v. Johnson, supra.
ORDER
For the foregoing reasons, the defendant’s motion to suppress is DENIED.

 Offlcer Santiago learned Spanish at home and also studied Spanish in high school. He has interviewed about three or four dozen Spanish-speaking individuals for the Lowell Police in the past.

 At the request of the defense attorney, the officer did the same during the hearing.

 The police ordered the defendant out of his apartment into the hall for the purpose of arresting him. Thus, the surest in the hall was the legal equivalent of an arrest within the apartment.

 No evidence was presented as to how long it would have taken to obtain a warrant. However, this arrest was in Lowell and it can be assumed that in a city of that size it would not take an inordinate amount of time for the police to locate an assistant district attorney to write a warrant application and to find a magistrate to issue a warrant.

 Although the defendant’s motion is captioned as one to suppress statements and evidence seized, no evidence was presented of any items seized.