Welch, J.
The defendant has filed a motion to suppress the statements he made to the Massachusetts State Police and Salem police officers on the early morning of August 22, 2000. The defendant claimed in his motion and affidavit that he did not voluntarily waive his Miranda rights and the statements were not voluntarily given due to his state of intoxication and exhaustion. The defendant also claimed that his statements must be suppressed due to the law enforcement authorities failure to electronically record the interview. During the hearing, the defendant orally moved to amend his motion to include another basis for suppression of the statements. The defendant argued that the Commonwealth had intentionally violated the statute, G.L.c. 276, §33A, which requires the police to *117 inform a person held in custody of his right to use the telephone and to allow such telephone use within an hour after the detained person arrives at the police station.
After hearing extensive testimony from several witnesses, this Court makes the following findings of fact and rulings of law.
FINDINGS OF FACT
Around 1:00 a.m. in the early morning of August 22, 2000, Massachusetts State Trooper Pi Downsborough received a telephonic request that she respond to Salem at a scene of a potential homicide. Trooper Downsborough is an experienced State Trooper who was assigned to be on call that evening. Trooper Downsborough learned that a Kim Pelusi had been seriously assaulted in her fourth floor apartment at 304 Essex Street in Salem, Massachusetts and was in critical condition. Trooper Downsborough did not enter the apartment but did learn the defendant was the boyfriend of Kim Pelusi, shared the fourth floor apartment with her, had some history of violence, and was present in the apartment earlier that day. Trooper Downsborough, or Sargent Steven Bona of the Salem Police requested a police broadcast to Salem and neighboring areas to hold defendant Dagley for questioning should any police officer encounter Dagley.
Trooper Downsborough, shortly after responding to Salem, received a transmission and went to 4 Mill Street in Beverly, Massachusetts. She arrived there approximately 1:25 a.m. By this point she learned that Kim Pelusi had died. When she arrived, uniformed Beverly police officers were present. There was a female on the porch of 4 Mill Street and the defendant was sitting on the stairs of that address. At this time, Trooper Downsborough was accompanied by Sergeant Steven Bona of the Salem Police Department. She asked the defendant if he would come to the Salem Police station so that she could ask him some questions. The defendant agreed to go back to the police station with Trooper Downsborough but requested that he first be permitted to finish the cigarette that he was smoking. The defendant finished smoking the cigarette. Then the defendant, who was standing at this time, held out his hands in front of him to Trooper Downsborough as if his wrists were to be handcuffed. Trooper Downsborough stated to the defendant that he was not under arrest. Rather, she explained, she was just asking the defendant to come back to the police station so that they could ask the defendant certain questions. Again, the defendant agreed and walked by himself to the police cruiser. The defendant had no difficulty walking to the police cruiser but he did favor one side and did complain of pain in the rib area. Later, back at the police station, the defendant stated that he had been assaulted earlier in the evening by a male and that this explained the pain in the rib area.
The defendant got into the back seat of the police cruiser. Trooper Downsborough was seated next to him. The Trooper had a veiy brief conversation with the defendant. The defendant asked what she wanted to talk to him about. Downsborough responded that it was “about Kim” but advised the defendant that they would talk more at the police station. This essentially ended the conversation. The defendant had no difficultly speaking at the time and responded appropriately to questions. He did have the smell of stale alcohol on his breath but exhibited no other signs of intoxication. The defendant was well experienced with the police, the arrest process, and the criminal justice system, having been arrested and convicted on previous occasions.
Shortly thereafter, the police cruiser arrived at the Salem Police Department. The defendant exited the cruiser by himself and walked up two flights of stairs to the Detective Unit conference room in the Salem Police Department. Again, the defendant had no difficulty walking. The defendant and Trooper Downsborough and Sergeant Bona sat down in the room. By this point, Sargent Bona had, at least, quickly reviewed the defendant’s criminal record and found that it contained a history of arrests and convictions for assaults and batteries. The law enforcement officials although carrying sidearms in their holsters, at no time displayed any weapons. The defendant was not handcuffed. A telephone was located in the conference room directly in the defendant’s line of sight. Exhibits 7 and 8. At this time (approximately 1:55 a.m.), Trooper Downsborough and Sergeant Bona were seated approximately two to three feet away from the defendant. Once in the police station, both Trooper Downsborough and Sergeant Bona noticed that the defendant had what looked like some blood on his hands and on a shoe. At no time during this evening did Trooper Downsborough, or any other police officer, notice that the defendant was having any difficulty concentrating, maintaining eye contact, failing to appropriately respond to questions, exhibiting any type of disorientation, or any signs of intoxication.
Trooper Downsborough then explained to the defendant that she was going to read him his Miranda warnings and if he had any questions about these warnings that he should simply ask her those questions. The defendant acknowledged the Trooper’s statement. At 1:55 a.m., Trooper Downsborough read each Miranda right off the sheet individually and requested a response from the defendant after each right was explained. The defendant responded verbally that he understood each of the rights. The defendant responded by saying “yes ma’am.” Trooper Downsborough noted these responses on the Miranda form. Exhibit 1. After reading all the Miranda rights and obtaining the affirmative responses, Trooper Downsborough requested that the defendant read and sign the Miranda form sheet. The defendant did. The Miranda form sheet was witnessed by Trooper Downsborough and Sergeant Bona. Exhibit 1.
*118 RULINGS OF LAW AND FURTHER FINDINGS OF FACT
1. Reasonable Suspicion Does Not Equal Custody
The Miranda warnings were given at 1:55 a.m. At this time, the police realized that they had no probable cause to arrest the defendant. They did know that the defendant had been the boyfriend of Kim Pelusi and that he had lived in the same apartment where the apparent homicide had occurred. Sergeant Bona had looked at the defendant’s Bureau of Probation record and saw that the defendant had a history of prior arrests and convictions for assaultive behavior. They also knew that the murder scene contained some amount of blood. Finally, they could observe that the defendant had what looked like some visible blood on his shoes and his hand. This information certainly raised a reasonable suspicion in the minds of Trooper Downsborough and Sergeant Bona, but they were understandably unsure of whether they had any probable cause to arrest the defendant for the crime. Therefore they made it clear to the defendant that he was not under arrest and he was being asked to voluntarily answer certain questions. This is true even though the officers took the additional precaution of reading the defendant his Miranda rights. At the point when the interview began, the defendant knew, and any reasonable person in the defendant’s position would know, that he was free to go and was not in custody.
2. An Alert, Sober, and Experienced Defendant
The defendant claims that he could not understand the Miranda rights that were given to him due to drug and alcohol consumption and because he was very tired. I do not credit these assertions in his affidavit. Other than the stale odor of alcohol on the defendant’s breath, he exhibited absolutely no other signs of intoxication. He was able to walk without any problem, he responded intelligently to questions, he was oriented at all times, and the defendant was alert at all times. Certainly booking photographs taken later in the evening (at approximately 4:00 a.m.) show an individual who does not appear in any way tired or intoxicated. Exhibit 5A. To the contrary, I credit the testimony of Trooper Downsborough and Sergeant Bona. These police officers were in close proximity with the defendant for an extended period and plainly could observe any type of intoxication or other mental inability to understand what was going on. These experienced officers noticed no such problem.
3. The Interview
Trooper Downsborough, after the defendant voluntarily waived his Miranda rights, then began to question the defendant. The questioning throughout was in a conversational tone. At no time was the questioning adversarial. The questioning did not include any threats, harassment, or trickery. The defendant was responsive to all questions. He did not appear to be frightened. On the contrary, he was communicative and cooperative. At no time did he slur his words and all of his responses were logical and appropriate. At times the interview took on a question and answer format and other times the defendant gave a narrative explanation. As is apparent from the content of the interview, the defendant was allowed to explain his activities in his own words and in a sequence and structure of his own choosing. At no time did the defendant request any medical attention or any other type of assistance.
Although a tape recorder and a video camera were available in the Salem Police Department, Trooper Downsborough and Sergeant Bona did not electronically record the interview. Instead, Trooper Downsborough wrote out the substance of the defendant’s statement on paper. The interview lasted approximately two hours. After the first hour and fifteen minutes, the law enforcement officials and the defendant took a five minute break. The defendant went to the bathroom, accompanied by a Salem police officer, and had a cigarette. This bathroom and cigarette break occurred at approximately 3:15 a.m.
By this point, the defendant had essentially confessed to beating his girlfriend Kim Pelusi that evening. The confession was a long time in coming. Initially the defendant claimed that he and Kim only had an argument and that he had fought with a third party. Then, he admitted pushing Kim but that the blood on his hand came from “whacking” a Puerto Rican male. The defendant then told of a "Ronnie” from a shelter being present when Kim pulled out a knife. The defendant and Kim then fought and she told the defendant “to get the fuck out.” He continued to insist a third party had “whacked” him that evening. Finally, the defendant admitted he hit Kim “once or twice” and continued: “I know I hurt her when I hit her. I hurt her bad. I know that because she was bleeding a lot ... I lost control... I punched her and she fell. She didn’t move after that... All three shots were to her face. She was making noises. I think the noise was from the blood. I got scared and thought the cops were going to come because we made a ruckus so I took off.” This admission occurred very shortly before the 3:15 a.m. break. By the time of the break, the police certainly did have probable cause to arrest the defendant and it is fair to assume at that point the defendant was not free to leave the confines of the Salem Police Department. Of course the subjective beliefs of the officers “are irrelevant in the determination whether a person being questioned is in custody,” except to the extent that those beliefs influence the objective conditions surrounding interrogation. Commonwealth v. Morse, 427 Mass. 117, 124 (1998). Here the manner of questioning did not change after the confession. Still, the defendant was well acquainted with the criminal justice system. He realized that he had just confessed to a serious crime. Any reasonable person would realized he was not free to leave. Reflective of this was the fact *119 that, when the defendant went to the bathroom, a Salem police office accompanied him. Thus, it is fair to assume at 3:15 a.m. the defendant was in custody even though no formal arrest had yet been made.
The interview lasted approximately another forty-five minutes and concluded at approximately 4:00 a.m . . . The interview was in no way delayed or unduly prolonged. At the end of the questioning, the defendant was permitted an opportunity to read over the handwritten statement produced by Trooper Downsborough. The defendant did this and initialed each page. At least at two different points in the multi-page interview, the defendant made corrections and initialed those corrections. Then at the end of the entire statement, the defendant signed the statement. The defendant went even further then this and drew a line through the remainder of the last page (which was blank at the time) and wrote the initials EOS (apparently indicating end of statement).
At the time the defendant reviewed the statement, I find that the defendant was in full control of his faculties. He continued to appear alert and showed no signs of intoxication. The Commonwealth has proven, by proof beyond a reasonable doubt, that the Miranda warnings were given, that the defendant voluntarily waived those Miranda warnings, and that he made his statement voluntarily, freely and intelligently.
4. The Formal Arrest and Telephone Rights
At the conclusion of his statement, at approximately 4:10 a.m., the defendant was arrested and booked. At the time the defendant was booked, again, he did not evidence being under the influence of any alcohol. He was fully awake. At the booking (again approximately 4:10 a.m.) the booking officer, Sergeant Matthew Griffin of the Salem Police, informed the defendant of his right to make a telephone call pursuant to Chapter 276, §33A. The defendant took advantage of this opportunity and at approximately 4:50 a.m., called his mother. His phone call to his mother was overheard and the defendant said in substance “I hit her one too many times. She’s dead. I’m sorry your son’s a murder.”
It is undisputed that the first time the defendant received notification of his right to make a telephone call was at 4:10 a.m. This was approximately two hours after the defendant first arrived at the Salem Police station. It was also approximately forty-five minutes after the defendant can fairly be said to be held in custody. The standard procedure at the Salem Police Department, according to Sergeant Matthew Griffin, is not to inform a person of his right to use the telephone, pursuant to Chapter 276, §33A, until the person is formally arrested, brought to the station, and booked.
5. The Telephone Rights Statute: Section 33A — An Exercise in Interpretation
Section 33A contains mandatory language. It requires that the police official in charge of the station, or other place of detention, which has a telephone on the premises “shall permit the use of the telephone” for a person "held in custody.” The section also requires that the person held in custody “be informed forthwith upon his arrival at such station or place of detention, of his right to so use the telephone and such use shall permitted within one hour thereafter.” The Supreme Judicial Court has made it clear that any intentional violation of this statute shall result in the suppression of any statement obtained as a result of the intentional deprivation of the defendant’s right to make a telephone call. Commonwealth v. Jones, 362 Mass. 497, 502-03 (1972); Commonwealth v. Johnson, 422 Mass. 420, 429 (1996). Suppressing evidence as a result of intentional violation of this statute “is intended to make the Legislation effective in the absence of an expressed penalty of the violation.” Commonwealth v. Johnson, 422 Mass. at 429. See Commonwealth v. Bruce, 2000 WL 1545790 (Mass. Superior Court) (Fremont-Smith, J.) (suppressing statements for intentional violation of Section 33A when defendant brought to station in custody, interviewed and not given telephone rights until five hours later). The Supreme Judicial Court “has not extended the policy to unintentional deprivation by the police.” Id., citing Commonwealth v. Parker, 402 Mass. 333, 341 (1988); Commonwealth v. Bradshaw, 385 Mass. 244, 266 (1982).
The present factual situation presents a dilemma. It is true that Trooper Downsborough and Sergeant Bona did not inform the defendant of his right to use a telephone when he first voluntarily came to the Salem Police station. But there was no requirement to do so. At the time, the defendant was not “held in custody.” Contrast Commonwealth v. Bruce, supra. As already stated, the defendant had been asked to voluntarily come down to the police station, and explicitly had been told that he was not under arrest. The defendant took his time before entering the police vehicle to finish is cigarette. These are not the actions of someone who feels coerced into following police direction and answering their questions. He was told briefly by Trooper Downsborough that she wanted to ask him questions about his girlfriend Kim. There is no evidence that the defendant was in any was intimidated by police conduct. When the defendant arrived at the Salem Police station at 1:55 a.m. he was not in custody. Because the defendant was not “held in custody” at the time he arrived at the police station, Trooper Downsborough and Sergeant Bona had no statutory obligation to inform him of his right to use a telephone.
As earlier discussed, it is fair to hold the defendant was in custody by the time that the interview break occurred at 3:15 a.m. At that point the defendant was no longer free to go. The defendant was not told this and no formal arrest,occurred at that point. Indeed, it would have been rather nonsensical to formally arrest the defendant 3:15 a.m. After all, the defendant was entitled to a break during his interview to make sure he was comfortable and was not being coerced into *120 making a statement. A bathroom and cigarette break was taken. The police had yet to finish their questions and the defendant had not yet had to opportunity to read his statement and check its accuracy and to affirm that it was voluntary given. This was all done in a timely fashion immediately after the break. Thereafter, the defendant was immediately formally arrested and booked. It was at this time, approximately 4:10 a.m., the defendant is given the notification of his right to use a telephone. Once that right was given, the defendant was given a timely opportunity to use the telephone and he made the call at approximately 4:50 a.m.
Under this set of facts, one possibly could conclude that there was a technical violation of the statute, that is at 3:15 a.m. the defendant is at the police station which has a telephone and is in custody. The statute refers to a person being “informed forthwith upon his arrival at such station or place of detention.” Here, however, the arrival language of the statute is inapplicable, because the defendant was not in custody at time of arrival at the station. Therefore, one would assume that the statutory obligation to inform the defendant would occur once he is “held in custody” at the station. If one assumes that he is “held in custody” at the time he is allowed to have a break during the interview, conceivably he should be informed of his right to use a telephone at that time.
This, admittedly, is rather a strained interpretation of §33A. It is perfectly understandable why the law enforcement officials would choose to conclude their interview properly and promptly, give the defendant an opportunity to review the statement and ensure its accuracy and voluntariness, and then formally arrest the defendant. Once the interview is complete, it then make sense to formally arrest the defendant and immediately notify him of his right to use a telephone. This is not a case where a person suddenly confesses and the police must then give Miranda warnings. Here prophylactic Miranda warnings already had been given. Still, the safest and best practice may be for law enforcement authorities to verbally inform a suspect of his statutory right to use a telephone as soon as the suspect has confessed or provided sufficient evidence that a reasonable police officer would know that the suspect was to be formally arrested at the conclusion of the interview.[1]
But even assuming a violation of the telephone statute, it is plainly unintentional in this case. The factual setting of this case does not fit neatly within the wording of §33A. Like most statutes, the legislature phrased §33A to cover the most common and anticipated arrest situations. Namely, a person is arrested (or held in custody) on the street. That person then is brought to the police station in custody. See Commonwealth v. Bruce, supra. The person is then to be “informed forwith” of his right to use a telephone. Thus, as in Salem, the §33A notification is part of the initial booking process when one is brought to the station in custody. There is no reason to think that a police officer would interpret Section 33A to impose an obligation to interrupt a voluntary interview, once probable cause is established and before the interview has ended, and notify to suspect of his telephone rights. And it is at least questionable whether the legislature meant to impose such a burden. In this situation, this court confidently concludes that any violation, if there was one, of the telephone statute was plainly unintentional. An unintentional violation of the statute provides no basis for a motion to suppress.
6. Electronic Recording of Interview: As Goes Minnesota, So Goes Massachusetts?
The defendant’s final argument is a request for this court to make new law and require law enforcement officials to electronically record, either by tape recorder or video camera, any interview at a police station. It is true that the police officials here could have so recorded this particular interview. Such a practice might well be an effective law enforcement technique. The Massachusetts State Police appear to have a policy against such recording. That policy might well be outmoded. A jury hearing the defendant’s actual words when he describes the beating of his girlfriend might find that considerably more compelling evidence than a statement written by a police officer and signed by the defendant. Likewise, such a recording might help resolve any doubts about the mental state of the defendant at the time of interview. These, however, are policy considerations best addressed in the political process. The settled state of the law in Massachusetts is that there is no constitutional, statutory, or common law requirement that police officials electronically record interviews that takes place at a police station. Commonwealth v. LeBlanc, 433 Mass. 549, 553 n.5 (2001), and cases cited. Indeed, only two states, Alaska and Minnesota, have made such a requirement by judicial fiat. While the courts of these two fine states are surely well respected, this hardly shows a consensus that unrecorded police interviews in the station house raise serious due process concerns. This court declines to impose such an obligation upon the police.
CONCLUSION
For the reasons set forth above, the Motion to Suppress is DENIED. This Court finds beyond a reasonable doubt the statements were made voluntarily, freely and rationally. The defendant voluntarily waived his Miranda rights. There was no obligation to electronically record the interview. If there was a violation of Chapter 276, §33A, which is questionable in this unique fact situation, it was plainly unintentional and provides no basis for suppression.

 If the police should have informed the defendant of his Section 33A telephone rights at the time of the 3:15 a.m. break, and even assuming a deliberate violation, the only matters to be suppressed would be the rather non-consequential statements given after the break and before the formal booking.